MARK ROSENBUSH
Attorney at Law (CSB 72436)
214 Duboce Ave.
San Francisco, CA 94103
Tel: (415) 861-3555
Fax: (415) 255-8631

Attorney for Defendant
MORIS FLORES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 08 0730 WHA |
| Plaintiff, | ) | |
| vs. | ) | **DEFENDANT'S MEMORANDUM RE SENTENCING AND MOTION FOR DOWNWARD DEPARTURE** |
| | ) | Date: November 30, 2011 |
| MORIS FLORES, | ) | Time: 8:00 a.m. |
| | ) | Court: Hon. William Alsup |
| Defendant. | ) | |

Defendant MORIS FLORES submits the following memorandum concerning his sentencing in this matter. In sum, Mr. Flores submits that a sentence of 35 years imprisonment is sufficient to satisfy the requirements of the controlling statute, 18 U.S.C. section 3553.

I.     THE COUNTS OF CONVICTION

Defendant Flores was charged with three conspiracies and one substantive offense in the Third Superseding Indictment, and was convicted of each charge. The counts of conviction are: COUNT ONE – Conspiracy to Commit Racketeering - 18 U.S.C. Section 1962(d).; COUNT TWO - Conspiracy to Commit Murder in Aid of Racketeering - 18 U.S.C. Section 1959(a)(5); COUNT THREE - Conspiracy to Commit Assault With a Dangerous Weapon in Aid of Racketeering - 18 U.S.C. Section 1959(a)(6); and COUNT FOUR – Use/Possession of a Firearm in Furtherance of a Crime of Violence - 18 U.S.C. Section 924(c)(1)(A) and 2.

1    Though the Indictment also charged numerous substantive counts wherein co-defendants were

2    charged with committing murders and assaults and other crimes in the course of the racketeering

3    conspiracies, Mr. Flores is not charged in any of the substantive crimes of violence.  See Third

4    Superseding Indictment.  The Indictment similarly does not charge Mr. Flores with having committed

5    any specific predicate racketeering act.

6    II.    THE APPLICABLE GUIDELINES.

7          A.    The Count One Racketeering Conspiracy.

8          Over Mr. Flores' repeated objections, the Court held that the government need not submit to the

9    jury the question of which predicate racketeering acts were the target offenses of the conspiracy.  As a

10   result, there is now no jury verdict as to whether Mr. Flores was liable, as predicate acts, for the five

11   murders set out in the Presentence Report.  See PSR at ¶¶ 76-111.

12         Initially, the PSR counts each of five separate homicides as if each was a first degree murder

13   committed by Mr. Flores and thereby arrives at a base offense level of 43 and an adjusted offense level

14   of 47.  See PSR at ¶ 76-111.  The PSR then groups each murder as a separate offense, which results in

15   the application of five additional offense levels.  See PSR at ¶ 111.  Mr. Flores asserts these homicides

16   should not be grouped as five separate offenses.

17         The application notes to Guidelines section 2E1.1 state, "[w]here there is more than one

18   underlying offense, treat each underlying offense as if contained in a separate count of conviction for

19   the purposes of subsection (a)(2). To determine whether subsection (a)(1) or (a)(2) results in the greater

20   offense level, apply Chapter Three, Parts A, B, C, and D to both (a)(1) and (a)(2). Use whichever

21   subsection results in the greater offense level."  See U.S.S.G. § 2E1.1(2), Application n.1.  Similarly,

22   Guidelines section 1B1.2 provides, "[a] conviction on a count charging a conspiracy to commit more

23   than one offense shall be treated as if the defendant had been convicted on a separate count of

24   conspiracy for each offense that the defendant conspired to commit."   See U.S.S.G. § 1B1.2(d).  The

25   application notes to that Guideline also state,

26         [p]articular care must be taken in applying subsection (d) because there are cases in
           which the verdict or plea does not establish which offense(s) was the object of the
27         conspiracy.  In such cases, subsection (d) should only be applied with respect to an
           object offense alleged in the conspiracy count if the court, were it sitting as a trier of
28         fact, would convict the defendant of conspiring to commit that object offense.

1   U.S.S.G. § 1B1.2(d), Application n.1.

2          As the Eleventh Circuit has noted, "[i]t will not always be clear what the underlying

3   racketeering activity is under *U.S.S.G. § 2E1.1(a)* for the purpose of calculating the defendant's offense

4   level, because the jury's verdict or the guilty plea may not specify which of the offenses listed in the

5   indictment was the object of the conspiracy. In these circumstances *section 1B1.2(d)* instructs courts

6   how to select the appropriate offense level." *United States v. Farese*, 248 F.3d 1056, 1060 (11th Cir.

7   2001). The *Farese* court went on to hold,

8          [w]e have interpreted the words 'were it sitting as a trier of fact' in [Guidelines section
       1B1.2] commentary to mean that the district court must find beyond a reasonable doubt
9          that the defendant conspired to commit a particular object offense before the court can
       sentence the defendant on the basis of that offense. *See  Ross, 131 F.3d at 990* (citing
10         *United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993)).*

11  *Farese*, 248 F.3d at 1060-61; see also *United States v. Tocco*, 306 F.3d 279, 287 (6th Cir. 2002)("We

12  recognize that because the jury verdict for the Count 1 RICO conspiracy was general, we do not know

13  whether the jury found Tocco guilty of the conspiracy in regard to the Versaci Gambling Operation.");

14  *United States v. Corrado*, 227 F.3d 528, 541 (6th Cir. 2000)("The jury's general verdict of guilty as to

15  the RICO conspiracy count did not indicate whether the jury found that the defendants had actually

16  conspired to murder Bowman."); *United States v. DiGiorgio*, 193 F.3d 1175, 1177-78 (11th Cir.

17  1999)(because the jury returned a general verdict finding the defendants guilty of RICO conspiracy that

18  was ambiguous as to which acts supported the conspiracy conviction, the court properly based the

19  defendants' offense level upon predicate acts that the court found the defendants had committed

20  beyond a reasonable doubt.).

21         In *United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001), the sentencing court faced a similar

22  predicament.  In *Nguyen*, the jury was not required to find which predicate acts each defendant had

23  agreed to commit or which acts each defendant knew and intended would be committed as part of the

24  pattern of racketeering activity.  It was unclear which predicate acts supported the guilty verdicts on the

25  RICO conspiracy counts.  *Id.* at 1341-42.  The Court of Appeals held the sentencing court was

26  "therefore required to determine the predicate acts underlying each defendant's conspiracy conviction

27  using the reasonable doubt standard." *Id.* at 1342.  The court went on to note,

28         [t]he offense levels of two defendants, Hoa Le and Pham, were based on findings by the
       court using the preponderance standard.  Moreover, the court's application of the

1       grouping rules to predicate acts it found using the preponderance standard led to Doan's offense level being increased by two levels, changing his guideline range from 188 to

2       235 months to 262 to 327 months imprisonment.  For this reason, the sentences of defendants Hoa Le, Pham and Doan must be vacated.

3 *Id*. (footnotes omitted).

4

5       Mr. Flores acknowledges that there is a circuit split on the issue of whether the Court must

6 apply a beyond a reasonable doubt or preponderance standard.  See, e.g., *United States v. Massino*, 546

7 F.3d 123, 135-36 )(requiring a preponderance standard and collecting cases to that effect).

8       Because there in not sufficient evidence to find Mr. Flores either participated in or conspired to

9 commit any of the five murders upon which the PSR relies, the additional five offense levels for

10 grouping of the supposed separate underlying offenses should not apply.

11       B.     <u>Mr. Flores' Role in the Offense.</u>

12       Mr. Flores submits that the recommended adjustment is not proper, and that the allegations in

13 the Presentence Report regarding his role in the offense are not supported by evidence.  See, e.g.

14 *United States v. Patterson*, 962 F.2d 858 (5th Cir. 1992)(upward adjustment for role in the offense

15 must be supported by reliable evidence, and cannot be based on speculation or unsworn hearsay

16 statements contained in the Presentence report).  The informants' conclusory allegations regarding Mr.

17 Flores' supposed role as the "leader" in 2008 are not sufficient to establish his leadership role.  See

18 *United States v. Graham*, 162 F.3d 1180 (D.C. Cir. 1998)(upward departure for "leader" role not

19 warranted where informant testified in conclusory manner that defendant was a "lieutenant" in cocaine

20 distribution organization).

21       There is simply no evidence before the Court that the other defendants were under the control

22 of Mr. Flores, and absent such control the adjustment is not warranted.  See *United States v. Bapack*,

23 129 F.3d 1320 (D.C. Cir. 1997)(control over criminal scheme does not warrant aggravating role

24 adjustment unless defendant actually controlled other participants); *United States v. Ramos-Oseguera*,

25 120 F.3d 1028 (9th Cir. 1997)(though defendant may occupy important role in criminal organization,

26 upward adjustment not warranted unless it is shown that defendant exercised control over other

27 participants).

28       The government's evidence of Mr. Flores' alleged leadership role in the gang comes solely

from the informants/cooperators and opinion testimony from SFPD Gang Task Force Officer Molina.

However, while Mr. Claros-Acosta recorded hundreds of phone calls and face-to-face meetings between MS-13 members, they do not evidence Mr. Flores' leadership of the 20th St. Clique.  There is one recording in which Mr. Flores' role in MS-13 is discussed at length at a gang meeting on August 23, 2008, at the very time the government claims Mr. Flores had assumed the role of leader.[1]  In that meeting, as reflected on the bodywire recording, various MS-13 members, including the informant Claros-Acosta and Mr. Flores, discuss various people potentially acting as the leader of the 20th St. Clique.

During the meeting, un-charged co-conspirator Juan Carcamo clearly acts as the leader of the group and gives a series of orders to various members, including Mr. Flores.  At one point Carcamo tells Flores that Flores needs to "collect rent" from "Nieros".  Flores responds that he does not want to "collect the rent" because he is afraid the "Nieros" will tell Gang Task Force Officer Molina and that he will be arrested.   Flores then says to Carcamo and Claros-Acosta  that they are in touch with the "big homeys down south" (MS-13 leaders in Los Angeles and Central America), and that he is just a soldier.  Carcamo then asks Flores if he wants to "run this thing," and Flores replies no.

Flores, Carcamo and Claros-Acosta then discuss leadership and who will have "the wheel" and communicate with the "big homeys."  Flores repeatedly states he does not want to be in charge, or to be the one to communicate with the "big homeys," and that Carcamo or Rafael Montoya should take leadership.

Carcamo then addresses the members and says that if they don't want to be part of El Salvador's or Los Angeles's "program," he will call the "big homeys", and 20th St. MS will operate separately.  Mr. Flores then addresses the members and clearly states he is not willing to "take the wheel," or "call the shots," or to communicate with the "big homeys."  The informant, Claros-Acosta, then starts explaining that the only problem is communication, that Montoya can handle that, and that Flores should take "the wheel."  However, Flores states he does not want "the wheel," he is only in 20th St. because of "Psycho" (Marvin Carcamo, Juan Carcamo's brother), that he can't "run this thing," and that he needs to work to support his family.  Claros-Acosta then says, "so what's the deal

---

[1] This recording is labeled Bates number DH201.  The government proffered this recording at trial, but the Court excluded it due to Claros-Acosta being unavailable as a witness.  See RT 10554-56.

1  because you guys haven't made a decision here?"  Carcamo then says Flores should be the leader, and

2  Flores repeatedly says no.  Claros-Acosta then states, "I think 'Slow' (Mr. Flores' nickname) can't give

3  up bein' in charge like that, either, because Psycho left you, homey."   Montoya then says Flores should

4  be in charge and Claros-Acosta agrees.

5          This recording shows that as of August 23, 2008, about two months before the unsealing of the

6  Indictment and the following arrests, Mr. Flores was not the leader of 20th St. "clique" of MS-13, and

7  that Claros-Acosta (who was an informant, and a *de facto* leader) was trying to push Flores to take a

8  leadership role.  It is also important to note that this conversation occurred after the murders and

9  assaults on the "Nieros" and "Nortenos" that the government claims Mr. Flores ordered or encouraged

10  in his supposed role of leader.  The last of the assaults supposedly attributable to Mr. Flores' leadership

11  was the killing of Ivan Miranda on July 31, 2008.  Thus, while the government and Probation claim

12  Flores was a leader of MS-13 and ordered numerous assaults and killings during the summer of 2008,

13  Claros-Acosta was plainly attempting to convince Flores to be the leader in late August of 2008.

14  Moreover, there is a great deal of evidence before the Court that Claros-Acosta represented to the 20th

15  Street members that he was authorized by the "big homeys" to guide the 20th Street clique, and that

16  following the arrests of Angel Guevara and Marvin Carcamo in December of 2007, they along with

17  Claros-Acosta, Juan Carcamo, Tigre, Lobo, and Sleepy, all played  roles in leading the 20th Street

18  clique in 2008.

19          C.       Objections to PSR Characterization of Mr. Flores' Role

20          The section of the report discussing "Role of Moris Flores" beginning at paragraph 59 indicates

21  that Flores "pushed an agenda that involved a greater degree of violence and aggression", and that "one

22  of Flores' objectives was retaliation against rival gang members" (paragraph 60), and that under

23  "Flores' direction, murders committed by MS-13 in San Francisco began to accumulate".

24          In fact, there is no testimony from any witness that Mr. Flores ordered any of the homicides that

25  were committed in 2007 or 2008.  This seems, however, to be the implication of paragraph 60.  This is

26  confirmed by paragraph 65, where the report indicates that "Although Flores did not personally commit

27  the murders, the death of each victim was an outcome of Flores' leadership and directive to seek

28

1  suspected rivals in the community". The report points to no testimony and specifies no factual basis in
2  making this assertion.

3  The leadership of the 20th Street Clique in 2008 was much more complex than the report seems
4  to indicate. Government cooperator Walter Palma testified that Cyco (Carcamo) and Peloncito
5  (Guevara) took over leadership in 2007, and that after they went to jail (in December of 2007) they
6  were "kind of running things from the jail" (Trial Tx 7394-7395). Palma and other cooperators
7  testified that Mr. Flores was a conduit between Cyco and Peloncito in jail, and the 20th Street members
8  who were on the street. Palma for example testified that Slow (Flores) was running things on the street
9  while Cyco and Peloncito were in jail (Trial Tx 7396, bottom). Palma also testified that the leadership
10 of Cyco and Peloncito was ongoing in the sense that they were the leaders in the MS Pod at the Dyer
11 Jail (after the arrests on this case, see Trial Tx 7494:20), and that Flores and Melvin Maldonado were
12 "messengers" at the jail - distributing information they were told to distribute (Trial Tx 7806:15-20).

13 Similarly, Government cooperator Abraham Martinez testified that Cyco and Peloncito were
14 "helping Slow run the neighborhood", and that in March of 2008 (when Martinez was out of custody
15 and interacting with 20th Street members) Slow would send the "[youngsters] to the store and stuff",
16 but he never ordered anyone to "go kill somebody" (Trial Tx 2307:1-15). Martinez further testified
17 that between March and July of 2008 he attended 5 or 6 20th Street meetings, only one of which was
18 run by Slow (the rest were run by Tigre - Ivan Cerna, see Trial Tx 2342:13-2343:4).

19 In fact the testimony indicates that there were a number of people who were in leadership roles
20 during 2008, rather than indicating that Mr. Flores was "the" leader who was pushing for an agenda of
21 increased violence, as the PSR seems to indicate. For example, Government cooperator Jose Espinal
22 testified that both Slow (Flores) and Sleepy were street leaders (Trial Tx 10820:5-15). Espinal also
23 testified that beginning in July 2008 20th Street member Sleepy was in charge (Trial Tx 10845:4-14).
24 This was during the time period when both the Estrada and Miranda homicides occurred. Espinal
25 reiterated later in his testimony that when he was told to go collect taxes in the Tenderloin by Roberto
26 Claros Acosta in 2008, it was Sleepy who was in charge (Trial Tx10876:10).

27 The government has taken the position that there was a transfer of leadership of the Clique from
28 Cyco and Peloncito to Mr. Flores in 2008. This position overly simplistic and is not borne out by the

1  evidence.  The situation was much more complex, and there were several individuals who played some

2  sort of street leadership roles during that year.  They included Tigre, Lobo, Sleepy and Slow (Flores),

3  as well as Cyco and Pelon, who continued to exercise leadership roles while incarcerated in the San

4  Francisco County Jail (as is evidenced by various jail telephone calls and intercepted correspondence

5  as well as witness testimony).  It is not correct for the PSR to state or imply that any increase in

6  violence by the 20th Street Clique in 2008 was under Mr. Flores' "direction".

7      The PSR fails to point to any evidence indicating Mr. Flores exercised control over the other

8  defendants, and no such evidence was adduced at trial.  The proposed four point adjustment for a

9  leadership role is therefore not warranted.

10  II.      MR. Flores' OFFENSE CONDUCT.

11      Mr. Flores agrees in part with the description of his offense conduct set out in paragraphs 42

12  through 66 of the Presentence Report.  However, as stated immediately above, Mr. Flores submits that

13  the description in the PSR of Mr. Flores' alleged leadership role and his supposedly "ordering" or

14  directing that certain murders be committed by other members of the conspiracy are not supported by

15  the evidence and appear in the PSR as simple repetition, without independent analysis, of allegations

16  the government made to U.S. Probation during "discussions with the U.S. Attorney's Office and the

17  case agents" (PSR, ¶42) that defense counsel were not invited to attend.

18      Similarly, the Presentence Report inaccurately implies that it was "under the authority of

19  Flores" that 20th Street members began to "tax" illegal document sellers who operated in the Mission

20  District.  See PSR at ¶ 62.  In fact, the testimony of numerous witnesses at trial showed that this

21  "taxing" activity began long before Mr. Flores assumed some sort of leadership role, including

22  extensive testimony about the fact that Ivan Cerna had a longstanding "tax" agreement with leader of

23  the document sellers (the "Miqueros"), Juan "Patas" Rodriguez.

24      Even the government admitted during its opening statement that the evidence "show[ed] that

25  under [Mr. Carcamo's] leadership, the gang took an aggressive and violent direction." See RT 1279.

26  Moreover, in its memorandum concerning Mr. Cerna's sentencing, the government informed the Court

27  that it "agrees that the 20th Street clique *became more bloodthirsty beginning in 2004 and 2005*, when

28  MS-13 gang members from Los Angeles and elsewhere settled into the Bay Area and sought to mold

the 20th Street clique in their own image." Docket #3840 at p.3 (emphasis added). Jaime Martinez testified that it was the other government informant, Mr. Claros-Acosta, who handed out new "rules" concerning which members would be required to commit shootings. See RT at 5545, 6406.

Finally, the Presentence report argues that Flores "frequently" possessed firearms and repeatedly had "constructive possession" of firearms, yet fails to point to or discuss a single occasion when Flores actually or constructively possessed a gun.

A.     The Ng/Joldic Homicide.

Mr. Flores admits that there is evidence before the Court from which the Court could conclude that on the night his friend Triste was shot, Mr. Flores went to the Excelsior neighborhood in order to retaliate against Norteno gang members. However, this same evidence shows that Mr. Flores was not with Erick Lopez that night and did not personally participate in the shooting of Mr. Ng and Mr. Joldic.

The transcript of one of the recordings made by Roberto Claros-Acosta, which was admitted into evidence at trial, reveals Mr. Flores talking with other members of 20th Street about Mr. Lopez getting arrested with the gun that had been used in this shooting. This recording was made a few days after the Ng/Joldic shooting, and on the recording Mr. Flores does not say anything about being present himself at the scene of the shooting. In fact, right after Mr. Flores tells Claros-Acosta that Lopez got arrested, Flores states, "*they're* screwed now." A few lines later, Mr. Flores says, "*they* hit them with everything," and "*they* killed them, *they* shot them man."

Similarly, the extensive phone records that were admitted into evidence (see Exhibits 997 and 1024) show that Flores was at the Little Park (Mission Playground) when Triste was shot, that he stayed around Little Park until after 11:00 p.m, and that he then went to San Francisco General Hospital (where Triste was being treated). The records indicate that at 1:05 a.m., right between the shots fired at Cypress St. and the shooting of Mr. Ng and Mr. Joldic, Lopez called Mr. Flores, but Flores did not answer. Flores then immediately tried to call Lopez back, but Lopez did not answer. When these calls were placed at 1:05 a.m., Flores' cell phone used the tower near Little Park, but Lopez's phone used a cell tower on Palou Street in Hunters Point.

The Ng/Joldic shooting occurred at about 1:47 a.m. on March 29, while the shooting at Mission and Cypress happened at about 11:45 p.m. on March 28. The records show that Mr. Flores' cell phone

1   hit cell sites at 2601 Mission St. (at 22nd) and 375 Alabama (at 17th) until 11:40 p.m. See in Exhibits

2   997, 1024.

3        Beginning at 11:57:23, Mr. Flores' phone began hitting a cell tower located at 1431 San Bruno

4   Avenue, and continued hitting that tower until about 1:04:23 a.m.  That cell tower is right across the

5   street from San Francisco General Hospital, where Triste was taken.  Moreover, the cell tower data

6   matches the testimony of Abraham Martinez, who said he saw Mr. Flores at SF General when he also

7   went to go see Triste at the hospital.

8        At about 12:30 a.m., while Mr. Flores' phone is hitting off the tower near the hospital, Erick

9   Lopez's phone is used to place a call to Mr. Flores.  Mr. Flores did not answer, and Mr. Lopez's phone

10  left  an 18 second voicemail.  Then, at 1:05 a.m., Mr. Flores twice tried to call Erick Lopez's phone.

11  Neither call connected, but Mr. Flores left a message on the second call.  See Exhibits 996, 996, 1024.

12       Beginning at 1:21:14, Mr. Flores' phone began hitting cell towers 025 and 36.  This continues

13  until 1:54:14.  Cell tower 025 is at 4610 Mission St., between Persia and Brazil, about 8 blocks from

14  where Mr. Ng and Mr. Joldic were shot.

15       Mr. Flores' phone continued to hit cell towers 025 and 036 until 1:55:46, about ten minutes

16  after the first 911 call was made concerning the shooting of Mr. Ng and Mr. Joldic.  In contrast, Mr.

17  Lopez's final call to hit tower 25 was at 1:48:22.  His next cell call to hit a tower was at 2:09:33 and hit

18  tower 256 in Berkeley.

19       These records clearly show that Mr. Flores and Mr. Lopez were not together when Lopez shot

20  Mr. Ng and Mr. Joldic.

21       B.    The Rodriguez Homicide.

22       The is no evidence whatsoever that Mr. Flores was present when Juan Rodriguez was allegedly

23  killed by Codefendant Cruz-Ramirez (see PSR at ¶ 62), or that Flores knew that Cruz-Ramirez

24  intended to commit the homicide before it happened.  There is similarly no evidence that Mr. Flores

25  aided or abetted Cruz-Ramirez in the homicide.  In fact, there is no evidence that Mr. Flores had any

26  contact with Cruz-Ramirez on the day of the killing.  Furthermore, although the PSR asserts that Mr.

27  Cruz-Ramirez was the killer, he was acquitted of this murder by the jury.

28

C.    The Estrada Homicide.

The evidence clearly established that Mr. Flores heard about the killing of Mr. Estrada. However, the evidence also showed Mr. Flores did not know about it ahead of time.  According to the governments theory, Mr. Estarada was killed by codefendants Herrera and Cruz-Ramirez.  See PSR at ¶ 63

Mr. Flores' work records, which were admitted at trial, show that Mr. Flores was at work at Restaurant Deport the entire day on July 11, 2011, when Estrada was killed.  See Exhibit 2325.  There is clear evidence that Mr. Herrera contacted Mr. Flores after the shooting.  The government's expert, Mr. Dikovitsky testified that there were several phone calls and text messages between Mr. Herrera and Mr. Flores that day.  See RT 12057, 12061.  However, the first two contacts are calls to Mr. Flores' phone at 1:40 and 1:41 p.m, about an hour and a half after Mr. Estrada was killed.  See *id.*; see also Exhibit 994.  There is no evidence of any phone or text contacts that day between Mr. Flores, who was at work, and Mr. Herrera prior to the killing of Mr. Estrada.

D.    The Miranda Homicide.

On the day of the Ivan Miranda homicide, the father of 20th Street member "Pistolita" was shot by government cooperator Walter Palma ("Capone") during a robbery.

Jose Espinal testified that as he left Little Park with Mr. Flores, Flores received a call from "Sleepy," who said that Pistolita's dad had been "hit."  Mr. Flores then told Espinal it was "Chapos," and because they couldn't "hit" 20th Street they were hitting their families.  See RT 10580-10581.

According to Espinal, Flores then said they should do something.   Espinal and Giovanni Hernandez looked for a knife in the car, but they did not find one.  See RT 10583.   Flores and Hernandez then asked Espinal to call "Duende" (Marlon Rivera) to tell him that they were picking him up.  *Id.*

Alejandro Flores, Ivan Miranda's friend since they were little, testified that neither he nor Ivan were Norteno gang members.  RT 3926-27.  On the night Ivan Miranda was killed Alejandro was with his girlfriend Natalie Linares.  RT 3935.  Ivan came and met them on Lisbon St.  RT 3942.

Shortly thereafter they were approached by Marlon Rivera (who Alejandro recognized) and four others (not including Mr. Flores).  See RT 3942-3944.  Alejandro testified he was "checked," and they

1   went through his pockets.  RT 3945.  The guys had knives, they took his MP3 player and his

2   headphones. RT 3946.  Ivan wouldn't give up his Ipod, and then he ran.  He was pursued  and stabbed

3   to death.  RT 946-47.

4         In sum, there is no evidence that Mr. Flores was involved in the robbery and killing of Ivan

5   Miranda, and Mr. Flores was not identified by any of the witnesses as being one of the three men that

6   approached Miranda and his friends and stabbed Miranda.  Moreover, Miranda and his companions

7   were not Nortenos, and did not appear to be rival gang members.  Even assuming that the killing of Mr.

8   Miranda was a spontaneous act done as revenge for Pistolita's father being shot, there is no evidence

9   Mr. Flores was either involved or somehow directed that others commit the attack.

10        The evidence adduced at trial indicates that each of the five homicides charged in the

11   indictment and described in the PSR were done in retaliation for violent attacks on 20th Street

12   members.  As such, it appears the retaliatory attacks involved little or no planning and instead were

13   crimes of opportunity.  The evidence also indicates Mr. Flores did not participate in any of the

14   homicides, nor is there evidence showing Flores was a part of whatever minimal planning may have

15   taken place before each attack.

16   III.    THE APPLICABLE SENTENCING FACTORS.

17        Under *United States v. Booker*, the courts must treat the guidelines as just one of a number of

18   sentencing factors set forth in the still valid portions of the Sentencing Act (18 U.S.C. § 3553), and all

19   sentences will be reviewed for "reasonableness," rather than compliance with the Guidelines.  See

20   *Booker* at 803-04 ("Without the "mandatory" provision, the Act nonetheless requires judges to take

21   account of the  Guidelines  together with other sentencing goals. See 18 U.S.C. A. § 3553 . . . Section

22   3553 . . . sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate

23   courts, as they have in the past, in determining whether a sentence is unreasonable.")  Since *Booker,*

24   these factors are all appropriate sentencing concerns, of which the guidelines sentencing range is only

25   one part.

26        As the Supreme Court noted,

27        after giving both parties an opportunity to argue for whatever sentence they deem
          appropriate, the district judge should then consider all of the § 3553(a) factors to
28        determine whether they support the sentence requested by a party.  In so doing, he may

not presume that the Guidelines range is reasonable ... He must make an individualized assessment based on the facts presented.

*Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596-97 (2007). The Court's decision in *Gall* also rejects an "appellate rule that requires 'extraordinary' circumstances to justify a sentence outside of the Guidelines range." *Id.*, 128 S.Ct. at 595.

On the same day it decided *Gall*, the Court held in *Kimbrough v. United States* that the Guidelines are advisory only, and "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder [cocaine] disparity yields a sentence 'greater than necessary' to achieve [18 U.S.C.] § 3553(a)'s purposes . . . ." *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 575 (2007). *Kimbrough* suggests that if the Court determines there is a similar, unintentional disparity among similarly situated defendants under the Guidelines, the Court could determine that "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." *Id.* However, the Guidelines range remains the "starting point" for the sentencing court's assessment of the appropriate sentence. See, e.g., *United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011).

Consistent with *Kimbrough*, the Court may sentence outside the guidelines and impose a statutory sentence in accordance with the factors in 18 U.S.C. § 3553(a). In addition to the parsimony provision, which requires that the sentence be "sufficient, but not greater than necessary, to comply with the [statutory] purposes," 18 U.S.C. § 3553(a), another factor is "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct...." 18 U.S.C. § 3553(a)(6). Accordingly, the Ninth Circuit has instructed that "[t]he overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary'" *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2007)(en banc). As a result, there is no presumption of reasonableness when a court imposes a Guidelines range sentence. *Carty,* 520 F.3d at 991-992.

The Sentencing Act directs the courts to consider the need for the sentence imposed –

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

1          (B)      to afford adequate deterrence to criminal conduct;

2          (C)      to protect the public from further crimes of the defendant; and

3          (D)      to provide the defendant with needed educational or vocational training, medical care,

4                    or other correctional treatment in the most effective manner.

5     *See* 18 U.S.C. § 3553(a)(2).  Section 3553(a) further directs sentencing courts to consider (1) the

6     nature and circumstances of the offense and the history and characteristics of the defendant; (3) the

7     kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the

8     offense under the Guidelines; (5) any pertinent policy statements issued by the Sentencing

9     Commission; (6) the need to avoid unwanted sentencing disparities among defendants with similar

10    records who have been found guilty of similar conduct; and (7) the need to provide restitution to any

11    victims of the offense.  Thus, the Guidelines range for the offense is but one of ten factors specified

12    under The Sentencing Act.

13    IV.    APPLICATION OF THE SECTION 3553(a) FACTORS TO MR. FLORES' CASE

14           WARRANTS A SENTENCE OF NO MORE THAN 35 YEARS IMPRISONMENT.

15           In accordance with *Booker, Gall, Kimbrough*, *Carty* and the directives of 18 U.S.C. § 3553(a),

16    Mr. Flores submits the following concerning the Court's consideration of an appropriate disposition of

17    his case.

18           A.    The Nature and Circumstances of the Offense and the History and Characteristics of Mr.

19                  Flores.

20           **1.      The Nature and Circumstances of the Offense**

21           The offenses at issue in this case are undoubtedly among the most serious that can be charged

22    in federal court.  However, Mr. Flores was not one of the primary protagonists in any of the charged

23    murders or assaults, nor did he ever arm himself for, or personally participate in any of the homicides.

24    In addition, Mr. Flores is not asking for a minor sentence; whatever the Court might decide, Mr. Flores

25    will serve several decades in prison.

26           Two important circumstances surrounding the commission of the instant offenses warrant a

27    sentence of less than life imprisonment for Mr. Flores.  First, as argued at length above, there is no

28    evidence indicating Mr. Flores personally participated in the charged homicides, and the PSR does not

1  claim that he did.  See PSR at ¶ 65.  Next, for the entire time when Mr. Flores was a member of 20th

2  Street, from the early 2000s when Flores was in his early teens (see PSR at ¶ 59) until his arrest in

3  2008, Flores was mentored in the gang by older members who were both leaders of the gang and active

4  government informants.

5          Jaime Martinez and Roberto Claros-Acosta were the two leaders of 20th Street in 2005 and

6  2006, when Mr. Flores became an adult and joined the conspiracy.  See, e.g., RT at 12820 (Martinez

7  testifying that when he was arrested in the Fall of 2005 he was the leader of 20 Street).  Martinez

8  further testified that he attended the meeting at Sutro Park where he and Claros-Acosta informed those

9  in attendance, including Mr. Flores, of the "new" way in which 20th Street would be run, and at which

10  Ivan Cerna was removed from leadership of 20th Street.  See RT at 12804, 5640; see also Exhibits

11  1201B, 2410.[2]  During the course of the meeting, Claros-Acosta informed Mr. Flores and the others

12  that everyone must be "jumped in," and that once you join the gang you are in it until death.  See

13  Exhibit 1201B, see also RT at 12836.  Claros-Acosta wanted to fix what he advocated to be problems

14  in the gang, such as a lack of knowledge of gang rules, and he dictated that there would be new rules

15  that the members must follow.  See RT at12875.  These new rules included putting in more "jale" for

16  the gang.  See RT at 2829, 3009.  Around this time, Martinez was also telling people that Claros-

17  Acosta was saying that 20th Street was being run wrong and criticizing Cerna's leadership.  RT at

18  2761-2770; see also RT at 2480-2481.  It is undeniable that at this time, when Claros-Acosta ordered

19  people to be jumped in, ordered those present to follow the "new rules" he was handing down, and

20  warned that failure would be punished by death (see RT 5858), Claros-Acosta was clearly a de facto

21  leader of the group, and he was working for ICE.

22          Martinez likewise acted as the leader of 20th Street in 2006, after he began working for the

23  government.  According to testimony by his own nephew, Abraham Martinez, when Ivan Cerna

24  stepped down as the leader of 20th Street, Mickey became the leader, a position he occupied until at

25  least early 2007. See RT at 2277, 2280; see also RT at 2816-217, 2847, RT at 7335, 7395 (Palma re

26  Martinez leadership).  While he was acting as a leader of 20th Street, Martinez ordered members to

27  ─────────────────

28          [2]  The record is replete with recordings of such meetings at which Mr. Flores was present.  See
Exhibits 120F, 152T, and 164T, 1200T and 1201B are just a few examples.

"become more organized" and informed the members that they must follow the "L.A. Program."  See RT at 2836-2837.  Martinez ordered members to commit a murder in order to become a "jumped in" member of the group.  See RT at 7343.  Abraham Martinez also testified that his uncle, while acting as a leader in 2006, told the members about the importance of following the new rules and doing "jale" for the gang.  RT at 3011-3013.  Walter Palma testified that in December of 2006, while Jaime Martinez was a leader of 20th Street as well as an informant, Martinez directed members to kill Manuel "Dreamer" Franco, a suspected informant.  See RT at 7897.

In fact, Martinez himself testified about his role in imposing the "LA program" on 20th Street members:

> By that time when I was being asked to be the leader of the gang, aside from that, I was being told that I would have to make my homies become involved in more violent acts, and, aside from that, they would have to begin to collect rent, charge taxes.  Of course, I had always been against that.  These people in El Salvador or Los Angeles, I would say yes to them. ...

RT at 6350.  Mr. Martinez also denied that he ever actually did what the "Big Homies" asked him to do.  *Id.*  However, the credible evidence indicates Mr. Martinez did in fact help institute the "LA program" while he was leader of 20th Street.

Similarly, at the various 20th Street meetings, Claros-Acosta told the group to "follow the rules of L.A., and we had to get our shit together, get the gang more organized."  RT at 2838; see also Exhibit 2414 (Martinez and Claros-Acosta giving the "rules" to those present at meeting, including Mr. Flores); Exhibit 2410 (Claros-Acosta informing the group that "there's been a disorganized mess in the, in the gang, . . . we're trying to organize this problem again here on the streets."); RT at 5560 (Martinez testifying about Claros-Acosta criticizing members for not "taxing" enough).  In fact, Mr. Flores was recorded (by Claros-Acosta) at a meeting led by Claros-Acosta and Martinez acknowledging that the rules require taking proposed new members "out to go and do a hit."  See Exhibit 2410 at 17.  Claros-Acosta also informed the group that they had to do "jale" in order to "earn their letters" See RT at 7618.  He also, while working for the government, tattooed various members of the 20th Street clique including Mr. Flores with MS-13 tattoos, knowing full well that by so doing he was branding these young men as gang members, binding them to the gang, and also knowing that such

1    branding was permanent since tattoo removal was punishable by death (as testified to by Carlos

2    "Tweety" Garrido).

3          Mr. Flores asserts that such directives from the leaders of 20th Street, who were also informants

4    at the time they were running the gang, carried powerful persuasive force given that Mr. Flores and the

5    other members were often reminded that failure to follow the rules would be punished by death.  The

6    compulsion presented by this type of inducement, in which the leader of a criminal organization orders

7    an underling to commit a crime with an implied threat, was recently recognized by the First Circuit in

8    *United States v. Luisi*, 482 F.3d 43 (1st Cir. 2007).  There, the court examined an entrapment defense

9    in which a government agent asked a higher ranking mafia member to order a subordinate to engage in

10   a crime with the informant.  *Id.*  The First Circuit found that the informant's use of the leader's

11   authority could constitute improper inducement:

12          In light of our understanding of the law, we think a properly instructed jury could
            conclude that the government was responsible for Merlino's order to Luisi.  Indeed, such
13          a jury could decide that: (1) Previte specifically requested that Merlino order Luisi to
            engage in the cocaine deal; (2) Previte's request came after earlier government efforts to
14          ensnare Luisi, without a middleman, had not been fruitful; (3) Previte, as an LCN
            captain, understood that the order he requested from Merlino would contain an implied
15          threat of death, physical harm, or serious retribution if Luisi failed to comply . . .

16   *Id.* at 56.[3]  Mr. Flores asserts that the orders handed down by Martinez and Claros-Acosta when they

17   were the leaders of 20th Street carried a similar implied threat of death.  In fact, there is ample evidence

18   in the record that Claros-Acosta sought to have former leader Ivan Cerna killed as punishment for

19   Cerna's alleged failure to properly organize 20th Street.

20          Finally it must not be overlooked that Mr. Flores lived with Manuel Franco, who was in effect

21   his "brother in law" due to Franco's relationship with Mr. Flores' sister, for several years during the

22   charged conspiracy.  Mr. Franco was several years older than Mr. Flores, mentored him in the ways of

23   the gang, encouraged him to abscond from his placements at juvenile group homes, and schooled him

24   in criminal behavior.  At the same time, Mr. Franco was a paid government agent, working for the FBI,

25

26

27          [3]  The Court in *Luisi* also noted that there was " a tape recording of the conversation in which
     the middleman pressured Luisi" (see *id.* at 54 n.11), just as there are multiple recordings in evidence in
28   this case in which Claros-Acosta and/or Mickey exhort the members of 20 Street to abide by the "L.A.
     program" and do more "jale" for the gang.

1    and actively recording selected incriminating conversations with Mr. Flores, as well as other MS-13

2    members.

3            The government's role in encouraging and nurturing Mr. Flores' participation in the gang

4    simply cannot in fairness be overlooked, and it is a critically important sentencing factor in the case of

5    Mr. Flores.

6            **2.     Mr. Flores' History and Personal Characteristics**.

7            Mr. Flores' personal history is accurately, but not fully, described in the PSR.

8            Jaime Martinez had a particularly negative impact on Mr. Flores' life.  Mr. Flores was very

9    young when he met and fell under the influence of Mr. Martinez, an older gang member and

10   government informant.  Mr. Flores met Martinez in 2002, when Flores first moved here from El

11   Salvador at 12 years old.  See RT at 5520-21.  Martinez testified that Flores joined 20th Street in 2003,

12   when Mr. Flores was 13.  *Id.*  Martinez thereafter began working for the government in the Fall of

13   2005, when Flores was 15.

14           Mario Molina testified that Mr. Flores admitted that he became involved in MS-13 in El

15   Salvador when he was a little boy of about 12 years, and that when Mr. Flores was stopped by the

16   police in San Francisco, he often admitted to joining 20th Street several years earlier.  Mr. Flores made

17   these statements when he was 16 and 17 years old, so it is clear that Mr. Flores joined the gang when

18   he was a young boy.  It is equally clear that Mr. Flores fell under the influence of several older gang

19   members.

20           As mentioned previously, Sabrina Manzanares, Mr. Flores' sister, had a long term relationship

21   and a child with Manuel Franco (see, e.g., RT at 10866), another older 20th Street member (he is four

22   years older than Mr. Flores).  Mr. Franco played the role of an older brother in Mr. Flores' life, and

23   actively encouraged and coached his participation in the gang and his criminal behavior.  Unbeknownst

24   to Mr. Flores, Mr. Franco also began working for the government as an informant in 2005, when Mr.

25   Flores was 15.

26           Federal and state courts treat juvenile offenders, even serious offenders, differently than adults

27   who commit serious crimes.  Juveniles "have a 'lack of maturity and an underdeveloped sense of

28   responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures,

1  including peer pressure'; and their characters are 'not as well formed.'" *Graham v. Florida*, 130 S. Ct.

2  2011, 2026 (2010).

3  From the time when Mr. Flores joined 20th Street until his arrest, Mr. Flores' gang activities

4  were supervised and led by a succession of government informants, including one who he lived with as

5  a family member, for years. And under the supervision and influence of these informants, Mr. Flores,

6  as well as the other younger members of the gang, were directed to perform more "jale," to extort more

7  "taxes," and to become more organized and violent. The informants were thus largely responsible for

8  20th Street members committing multiple homicides in 2008, and the Court must consider this fact in

9  deciding an appropriate sentence under section 3553.

10  Mr. Flores also showed reluctance to fulfill his obligations as an 20th Street member. He

11  presented testimony establishing that in 2007, he sought to have his MS-13 tattoos removed at the

12  Second Chance counseling center in the Mission (informant Carlos Garrido testified that the gang's

13  penalty for members removing tattoos was "death."). See, e.g., RT at 13935-38. Some of these tattoos

14  were placed on Mr. Flores by Claros-Acosta, while Claros-Acosta was working as an informant. See

15  RT 7531, 7682. Evidence of writings by Mr. Flores indicating his dissatisfaction with his life while a

16  gang member were also introduced. See Exhibit 700 (Notebook taken during 8/25/08 search of Flores'

17  apartment at 80 Forest Grove, Daly City). The August 2008 recording of the meeting between Flores,

18  Claros-Acosta and others, discussed at some length above, also reveals Flores' ambivalence about what

19  he was required to do for the gang. In that recording, Flores tells Claros-Acosta and Juan Carcamo that

20  he does not want to participate in "taxing" the Nieros and that he does not think it was fair to require

21  the younger 20th Street members to participate in activities that would inevitably result in their arrests.

22  Part of the rationale in imposing lesser sentences on youthful offenders is that "[j]uveniles are

23  more capable of change than are adults" and "'[f]rom a moral standpoint it would be misguided to

24  equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's

25  character deficiencies will be reformed.'" *Graham*, 130 S. Ct. at 2026-27 (quoting *Rope*r, 543 U.S. at

26  570). "Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and

27  rehabilitation." *Id.* at 2032.

28

1    Mr. Flores was about 12 when he actually joined the charged conspiracy and was 19 when he

2    was indicted and incarcerated, and his youth and potential for rehabilitation are personal characteristics

3    the Court must consider under section 3553.

4        B.    The Need for the Sentence Imposed to Satisfy Certain Articulated Purposes.

5            1.    **To Reflect the Seriousness of the Offense, to Promote Respect for the Law,**

6                 **and to Provide Just Punishment for the Offense**.

7        A term of 35 years imprisonment is comparable to sentences handed out in state and federal

8    courts for some of the most heinous crimes of which a defendant can be convicted.  See, e.g., Cal.

9    Penal Code §§ 187, 192 (25 to life for first degree murder); 21 U.S.C. § 841(b)(1)(A)(20 to life for

10   large-scale narcotics trafficking resulting in death); 18 U.S.C. § 2251A(a) (30 years to life for

11   trafficking in minors for the purpose of sexual exploitation).  The Eight Circuit recently noted that in

12   2010 the average sentence for murder convictions in that circuit between 2005 and 2010 was just under

13   250 months imprisonment.  See *United States v. Boneshirt*, 2011 U.S. App. LEXIS 22036, *34 fn.5

14   (8th Cir. 2011)(Bright, J., concurring).

15           **2**.    **To Afford Adequate Deterrence to Criminal Conduct.**

16       Mr. Flores submits that a term of 35 years would be more than sufficient to deter him from

17   committing any new offenses.

18           **3**.    **To Protect the Public from Further Crimes of Mr. Flores.**

19       Should the Court sentence Mr. Flores to the suggested term, Mr. Flores would be about 51

20   years old when he is released from prison and 56 years old when he completes his term of supervised

21   release.  Given this advanced age, there is much less chance that Mr. Flores will commit the types of

22   crimes of which he has been convicted.

23       C.    The Kinds of Sentences Available.

24       The Guidelines require a lengthy term of imprisonment, which Mr. Flores agrees is necessary

25   under the statutes.

26

27

28

D.   <u>The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines.</u>

Mr. Flores agrees that his Guidelines range, even if properly calculated, would result in a sentencing range of life imprisonment.  The 35 year sentence suggested by Mr. Flores represents a one level reduction of the otherwise applicable Guidelines range, from level 43 to level 42, if Mr. Flores' Guidelines calculations do not include the above discussed grouping and leadership adjustments.   At level 42, Mr. Flores' applicable range would be 360 months to life, so the suggested sentence of 420 months imprisonment would be well within that range.  Cf. , 552 U.S. at 51 (review of "the substantive reasonableness of the sentence imposed" must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range.")

E.   <u>Pertinent Policy Statements Issued by the Sentencing Commission.</u>

The Ninth Circuit and other circuits have held that sentencing judges may rely on any . . . policy statement[s] or commentary in the guidelines that might warrant consideration in imposing sentence.' *United States v. Lawrence*, 916 F.2d 553 (9th Cir. 1990) (citing U.S.S.G. s 1B1.1); see also *United States v. Bowser,* 941 F.2d 1019, 1023 (10th Cir. 1991); *United States v. Pickney*, 938 F.2d 519, 521 (4th Cir. 1991); *United States v. Brown*, 903 F.2d 540, 545 (8th Cir. 1990).

One of the primary goals of the Sentencing Guidelines is "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." *United States v. Reyes*, 8 F.3d 1379, 1385 (9th Cir. 1993)(citing U.S.S.G. Ch. 1, Pt. A(3), intro. comment).

F.   <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.</u>

Following *Booker* and the re-establishment of the primacy of the section 3553(a) factors, the courts must now consider the need to avoid unwarranted sentencing similarities among defendants who are not similarly situated, as well as unwarranted disparities among defendants who are similarly situated.  See *Gall*, 128 S. Ct. at 600 (approving of the judge's "consider[ation of] the need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated") (emphasis in original).

1   Mr. Flores submits that several co-defendants who were more culpable than Mr. Flores will

2   likely be sentenced to the same term of imprisonment - life - the government and U.S. probation are

3   recommending for Mr. Flores.  Moreover, other equally or more culpable defendants, including e.g.,

4   Ivan Cerna, Cesar Alvarado and Walter Chinchilla Linar, have reached plea agreements that will result

5   in considerably less serious sentences than that proposed by the government for Mr. Flores.  Mr. Cerna

6   was clearly the leader of the 20th Street clique for years until late 2005.  In the governments sentencing

7   memo regarding Mr. Cerna it asserted that the 20th Street clique *became more bloodthirsty beginning*

8   *in 2004 and 2005*, when MS-13 gang members from Los Angeles and elsewhere settled into the Bay

9   Area and sought to mold the 20th Street clique in their own image."  Docket #3840 at p.3 (emphasis

10  added).  Mr. Cerna was sentenced to 17 ½ years in this case.  Cesar Alvarado and Walter Chinchilla

11  Linar were both personally involved in the murder of Ivan Miranda, as well as being charged with the

12  racketeering conspiracies that Mr. Flores has been convicted of.  They were each sentenced to 20 years

13  in prison.  Considerations of possible sentencing disparity therefore militate in favor of sentencing Mr.

14  Flores to a term of years below the life terms the Court may give other defendants who personally

15  committed homicides, and proportional with the sentences agreed to by the government for similarly

16  situated co-defendants in this case who were permitted to plead guilty for considerably shorter

17  sentences.

18  Here, a life term for Mr. Flores would result in exactly the situation described in *Gall*.  Mr.

19  Flores, who did not commit or order any of the charged homicides, though he was convicted of

20  participating in racketeering conspiracies knowing that such homicides would occur, would receive the

21  same sentence as the defendants who did commit murders.

## **CONCLUSION**

23  For the foregoing reasons Mr. Flores, through counsel, respectfully suggests that a sentence of

24  35 years imprisonment is sufficient, but not greater than necessary, to comply with the statutory

25  purposes of sentencing.

26

27  Dated:  November 23, 2011.                                    Respectfully Submitted,

28                                                                                      /s/ Mark Rosenbush

MARK ROSENBUSH
Attorney for Defendant
MORIS FLORES