1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  W.S. WILSON LEUNG (CABN 190939)
   WIL FRENTZEN (LABN 24421)
5  Assistant United States Attorneys

6  THERYN G. GIBBONS (NYBN 4612867)
   Trial Attorney, Organized Crime and Gang Section
7
       450 Golden Gate Avenue, Box 36055
8      San Francisco, California 94102
       Telephone: (415) 436-6758
9      Facsimile: (415) 436-6753
       E-Mail: wilson.leung@usdoj.gov
10
   Attorneys for the United States of America
11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14               SAN FRANCISCO DIVISION

15  UNITED STATES OF AMERICA,        )    No. S3-CR-08-730-WHA
                                     )
16                                   )
          v.                         )    GOVERNMENT'S SENTENCING
17                                   )    MEMORANDUM FOR MORIS FLORES
                                     )    (DOCKET #5409)
18  MORIS FLORES,                    )
                                     )
19        Defendant.                 )
                                     )
20  _____ )

21  **I.     Introduction**

22          The Government respectfully submits this Sentencing Memorandum to advise the Court

23  of its position regarding the appropriate sentence for Moris Flores, as well as to respond to

24  Flores's sentencing memorandum of November 23, 2011 (Docket #5409).  Like the sentencing

25  claims of his co-defendants, Flores's claims are unsupported by either law or fact, and rather than

26  presenting any colorable ground for mitigation, confirm the need to impose the most severe

27  sentence possible.  In light of all the factors set forth under 18 U.S.C. 3553(a), the Court should

28  impose the statutory maximum sentence for each of the four counts of conviction, to run

consecutively.

**II.    Discussion**

    *A.    Applicable Sentencing Law*

Under the current sentencing regime, the Court must sentence in accordance with the directions of 18 U.S.C. § 3553(a).  Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth specific considerations, including: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; and the sentencing range under the Guidelines. 18 U.S.C. § 3553(a).  On appellate review, a sentence is reviewed for "unreasonableness" in light of these various factors.  United States v. Booker, 543 U.S. 220, 260-62 (2005).

Although the Supreme Court's decision in Booker has rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing.  Kimbrough v. United States, 128 S. Ct. 558, 574 (2007) (internal quotation marks and citation omitted); see United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*); United States v. Ellis, 641 F.3d 411, 415 (9th Cir. 2011).  While there is no presumption of reasonableness for a Guidelines range sentence, see Carty, 520 F.3d at 991-992, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Id. (citing Gall v. United States, 128 S. Ct. 586, 597 (2007)); see United States v. Munoz-Camarena, 631 F.3d 1028, 1030 (9th Cir. 2011) ("A district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence.").

"As a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing."  United States v. Armstead, 552 F.3d 769, 777-78 (9th

Cir. 2008); see, e.g., United States v. Treadwell, 593 F.3d 990, 1001 (2010).  In addition, the

sentencing court can consider all relevant information, including acquitted conduct, when

determining a defendant's sentence, so long as the sentence imposed does not exceed the

applicable statutory maximum and the court finds the conduct proven by a preponderance

standard.  See, e.g., United States v. Scott, 642 F.3d 791, 800-01 (9th Cir. 2011) (holding that use

of acquitted conduct at sentencing does not violate the constitution); United States v. Mercado,

474 F.3d 654, 656-57 (9th Cir. 2007) (reaffirming post-Booker validity of United States v. Watts,

519 U.S. 148 (1997) (per curiam), which held that acquitted conduct may be used for sentencing,

"'so long as that conduct has been proved by a preponderance of the evidence'") (quoting Watts,

519 U.S. at 157)); United States v. Massino, 546 F.3d 123, 135-36 (2d Cir. 2008) (holding that

"[w]hen the offense of conviction is a RICO conspiracy, relevant conduct may include

underlying predicate acts, even if not proven at trial beyond a reasonable doubt, as long as the

sentencing court finds that they were proven by the lower preponderance of the evidence

standard") (internal quotation marks and citations omitted); United States v. Yannotti, 541 F.3d

112, 129-30 (2d Cir. 2008) (holding that "all information adduced during trial, including

acquitted conduct," can be considered at sentencing; "[w]hile a fact-finder is required to find

guilt beyond a reasonable doubt, the sentencing court may find facts relevant to sentencing by the

lower preponderance of the evidence standard").  Furthermore, a defendant convicted of a

racketeering violation can be sentenced for "any act, whether or not charged against defendant

personally, that qualifies as a RICO predicate under 18 U.S.C. § 1961(1) and is otherwise

relevant under [U.S.S.G.] § 1B1.3."  United States v. Carrozza, 4 F.3d 70, 77 (1st Cir. 1993)

(footnote omitted); see U.S.S.G. § 1B1.3(a)(1)(B) (defining relevant conduct for sentencing "in

the case of jointly undertaken criminal activity" as "all reasonably foreseeable acts and omissions

of other in furtherance of the jointly undertaken criminal activity"); see, e.g.,United States v.

Morales, 655 F.3d 608, 636 (7th Cir. 2011) (affirming district court sentence that was based on

acts of co-conspirators because "'each and every overt act of violence in connection with the

RICO conspiracy, although perhaps not specifically agreed to by each and every defendant on

every specific occasion, was nonetheless reasonably foreseeable to each and every defendant

given the nature of their joint RICO enterprise.'") (quoting PSR adopted by the sentencing

court); United States v. Darden, 70 F.3d 1507, 1544-45 (8th Cir. 1995) (holding that murder with

which only others were charged but proven to have been aided and abetted by defendant was

properly considered relevant conduct for the defendant's sentencing); Carrozza, 4 F.3d at 74-78

(holding that the defendant could be sentenced for murders not charged against him in the

indictment or not charged at all in the indictment, so long as they were reasonably foreseeable to

the defendant and were in furtherance of jointly undertaken criminal activity); see also Salinas v.

United States, 522 U.S. 52, 65 (1997) ("A conspirator must intend to further an endeavor which,

if completed, would satisfy all of the elements of a substantive criminal offense, *but it suffices*

*that he adopt the goal of furthering or facilitating the criminal endeavor.*  He may do so in any

number of ways short of agreeing to undertake all of the acts necessary for the crime's

completion.  *One can be a conspirator by agreeing to facilitate only some of the acts leading to*

*the substantive offense.*  It is elementary that a conspiracy may exist and be punished whether or

not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, an

so punishable in itself.  [¶]  It makes no difference that the substantive offense under § 1962(c)

requires two or more predicate acts.  The interplay between subsections (c) and (d) does not

permit us to excuse from the reach of the conspiracy provision an actor who does not himself

commit or agree to commit the two or more predicate acts requisite to the underlying offense.")

(emphases added).  Indeed, "in a RICO case, in determining the base offense level, the

sentencing court should not limit its relevant conduct inquiry to the predicate acts charged against

the defendant, but instead should consider all conduct reasonably foreseeable to the particular

defendant in furtherance of the RICO enterprise to which he belongs."  United States v. Marino,

277 F.3d 11, 37 (1st Cir. 2002) (internal quotation marks and citations omitted).

> *B.*      *The Defendant's Sentencing Claims Have No Merit*

Given these legal principles, Flores's sentencing claims have no merit.

> *i.*      *The Probation Office Properly Attributed Five Murders to Flores*

Flores's objections to the Probation Office's calculation of the sentencing Guidelines are

unfounded.  His chief complaint is that the Probation Office erred by attributing the murders of

1    Ernad Joldic, Philip Ng, Juan Rodriguez, Armando Estrada, and Ivan Miranda to him, asserting

2    that "there is now no jury verdict as to whether Mr. Flores was liable, as predicate acts, for the

3    five murders set out in the Presentence Report."  This assertion betrays Flores's

4    misunderstanding of the law.

5            Under Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that any

6    fact that increases a defendant's potential punishment must be alleged and proven to a jury

7    beyond a reasonable doubt.  There is no Apprendi issue here.  The jury returned a special verdict

8    specifically finding that Flores contemplated both murder and conspiracy to commit murder as

9    racketeering predicates.  Accordingly, because both of these predicates carry a maximum

10   sentence that includes life imprisonment under California law, see CPL §§ 190 and 182, the

11   statutory maximum sentence for the racketeering conspiracy charged in Count One is life

12   imprisonment, pursuant to 18 U.S.C. § 1963(a).  The jury verdict for Count One specifically

13   allows for a sentence up to life imprisonment.

14           Flores's reliance on Sixth Circuit and Eleventh Circuit case law to support his claim that

15   the Court can only sentence him for conduct found by a jury beyond a reasonable doubt is

16   baffling.  First, the Sixth Circuit case he cites — United States v. Corrado, 227 F.3d 528 (6th Cir.

17   2000) — directly *contradicts* his position:

18           The defendants in this case were convicted of a RICO conspiracy, however, not a
19           multi-object conspiracy. . . .By contrast, a RICO conspiracy is considered a single
             object conspiracy with that object being the violation of RICO. . . .Thus, the
20           underlying acts of racketeering in a RICO conspiracy are not considered to be the
             *objects* of the conspiracy, but simply conduct that is relevant to the central
21           objective — participating in a criminal enterprise.  The existence of relevant
             conduct is determined at sentencing by a preponderance of the evidence.  At
22           resentencing, then, the district court would only be required to find that the
             defendants conspired to murder Bowman by a preponderance of the evidence in
23           order for this offense to be used to calculate the defendants' base offense level.

24   227 F.3d at 541-42 (internal quotations, citations, and alterations omitted, emphasis in original).

25           In addition, Eleventh Circuit law is not binding on the Court.  Indeed, Flores

26   acknowledges that "there is a circuit split on the issue of whether the Court must apply a beyond

27   a reasonable doubt or preponderance standard," (Flores Memo at 4), and cites the Second

28   Circuit's Massino decision.  Troublingly, however, Flores fails to cite controlling *Ninth Circuit*

1    authority, notably <u>Scott</u> and <u>Mercado</u>, racketeering cases that affirmed the sentencing court's use

2    at sentencing of *acquitted* conduct not found by a jury beyond a reasonable doubt.  <u>See</u> <u>Scott</u>, 642

3    F.3d at 800-01; <u>Mercado</u>, 474 F.3d at 656-57.

4          In truth, contrary to Flores's misstatements of law, the Court's determination of what

5    sentence to impose — up to the maximum of life — can and should be based on all relevant

6    conduct, pursuant to U.S.S.G. § 1B1.3, found by a preponderance standard.  In the case of a

7    racketeering conviction, relevant conduct for sentencing includes all reasonably foreseeable acts

8    taken in furtherance of the racketeering enterprise.  There is more than a preponderance of the

9    evidence to support the finding that the five murders attributed to Flores were both reasonably

10   foreseeable to him and were taken in furtherance of the MS-13 enterprise.

11         Starting with the second inquiry, it cannot be reasonably disputed that each of the five

12   murders were committed by a member of MS-13 as part of the operation of the gang.  The jury

13   convicted Erick Lopez of the murders of Ernad Joldic and Philip Ng, and the evidence

14   established that these murders were in retaliation for the shooting of MS-13 member Danilo

15   Velasquez ("Triste") earlier that night.  Likewise, the jury also convicted MS-13 members

16   Guillermo Herrera and Jonathan Cruz-Ramirez of the murder of Armando Estrada as part of the

17   war MS-13 declared against *nieros*.  In addition, MS-13 members Cesar Alvarado and Walter

18   Chinchilla Linar pleaded guilty to racketeering conspiracy predicated on the murder of Ivan

19   Miranda, and they specifically allocuted that Miranda was killed during a retaliatory hunt for

20   *Norteños* following the shooting of the father of an MS-13 member.

21         As for the murder of Juan Rodriguez, although the jury acquitted Jonathan Cruz-Ramirez

22   for this murder, the preponderance of the evidence in the record demonstrates that Cruz-Ramirez

23   killed Rodriguez as part of MS-13's war with the *nieros*.  Among other evidence was presented

24   the following:

25         (1) Firearms examination confirmed that the .380-caliber handgun used in the May 31,
           2008 murder of Rodriguez was also fired in the April 22, 2008 non-fatal shooting of Ivan
26         Olmedo, Carlos Villegas, and Sergio Hernandez, which, according to cooperator Jose
           Espinal, Cruz-Ramirez and other MS-13 members carried out, see Tr. at 8524-43
27         (testimony of firearms examination expert John Sanchez); Tr. at 10532-40 (testimony of
           Jose Espinal);

28   //

(2) Jose Espinal testified that a few days before he learned of Rodriguez's death, MS-13 leader Moris Flores complained that the *miqueros* — i.e., *nieros* — were "out of line" and that "Patas" — i.e., Rodriguez — was organizing them;

(3) Espinal also testified that Cruz-Ramirez taunted the *nieros* when they mourned Rodriguez's death, stating, "Poor thing.  They killed Patas," and "The *jale*'s already done," Tr. at 10566;

(4) Cooperator Walter Palma testified that MS-13 member Edwin Ramos ("Popeye") stated that Cruz-Ramirez claimed he (Cruz-Ramirez) killed Patas over "rent" and that "Pasadena" — i.e., members of MS-13's PLS clique — were involved, Tr. at 7456;

(5) Palma also testified that Cruz-Ramirez claimed he (Cruz-Ramirez) emptied a whole clip into "Patas," see Tr. at 7461;

(6) Cooperator Abraham Martinez testified that Cruz-Ramirez bragged twice about killing "Patas," explaining to Martinez that it was good for the gang and that he (Cruz-Ramirez) was doing his "duty," and that the last words of "Patas" were "*chale carnal*," Tr at 2406-11; and

(7) Cooperator Jose Alvarado testified that Cruz-Ramirez likewise bragged about killing "Patas" and claimed that the last words of "Patas" were "*chale niero*," Tr at 8811-16.

In addition, the evidence establishes by more than a preponderance that these five murders were reasonably foreseeable to Flores.  In 2008, Flores was the street leader of the 20th Street clique, and the five murders in dispute were committed under his exhortations, if not his direct orders.  For instance:

(1) Cooperator Abraham Martinez testified that following the non-fatal shooting of MS-13 member Danilo Velasquez ("Triste"), Flores rallied 20th Street members at San Francisco General Hospital and declared that they had to retaliate, see, e.g., Tr. at 2201 (Abraham Martinez), which led to Erick Lopez's retaliatory killing of Ernad Joldic and Philip Ng;

(2) Cooperator Jose Espinal testified that some time following the shooting of Velasquez, Flores told him that after Velasquez's shooting, he (Flores) and "Spooky" (Erick Lopez) got high on cocaine, looked for "*chapos*" and did a *jale*, Tr at 10530, referring to the Joldic/Ng murders;

(3) Cooperator Walter Palma testified that, while in jail with Flores, Flores told Palma that the night "Triste" was shot, he (Flores) had put in a lot of "work," Tr. at 7497;

(4) Cell site location records for the telephones of Erick Lopez (415-933-4207, GX 996) and Moris Flores (415-368-2649, GX 997) indicate that between roughly 1:21 am and 1:50 am — the approximate time of the Joldic/Ng murders – Flores's telephone was in contact with cell Tower F036 and F025, the second of which was within 8 short blocks and 1 long block of the site of the Joldic/Ng murders, while at roughly 1:48 am — just two minutes before the murders — the Lopez's telephone was in contact with Tower F025, suggesting that both Flores and Lopez were in the vicinity of the Joldic/Ng murders at the approximate time of the murders;

//

(5) The cell site records also indicate that beginning minutes after the Joldic/Ng murders, the telephones of Flores and Lopez proceed in a leap-frog pattern from San Francisco to the East Bay, and proceed north in the East Bay, suggesting that Flores and Lopez were either traveling together or were traveling toward the same destination following the murders;

(6) On or about April 1, 2008, Flores talked about "Triste"'s shooting and then talks about retaliatory killings, see GX 150T (transcript of April 1, 2008 recording);

(7) As noted above, according to Espinal, a few days before he learned that "Patas" was killed, he heard Flores complain that the *miqueros* were "out of line" and blame "Patas" for organizing the *miqueros*, Tr. at 10564;

(8) According to Espinal, on July 10, 2008, the day before the Armando Estrada murder, Flores again declared that the *miqueros* "out of line" and were disrespecting MS-13, and organized two groups of MS-13 gang members to fight with the *miqueros*, which led to MS-13 member "Pistola" getting shot twice, "Sleepy" getting stabbed, and "Sparky" — Guillermo Herrera — getting grazed by a bullet, see Tr at 10568-70, which, in turn, led Herrera to shot-gun Armando Estrada to death the very next day;

(9) Text messages for Flores telephone indicate that, after Herrera killed Estrada, Flores advised him to call "Drimer," i.e., MS-13 member "Dreamer" (Manuel Franco), as well as contacted Franco to pick up Herrera; later text messages from Flores to Herrera indicate that Flores was advising Herrera what to saw to the police and suggesting an alibi, see GX 985 and 985T;

(10) Cell site records for the telephones of Guillermo Herrera and Manuel Franco indicate that the two met in Oakland several hours after the Estrada murder, that they traveled to the southeastern part of San Francisco, and that they then separated, see GX 993 (Franco telephone) and 994 (Herrera telephone);

(11) According to Jose Espinal, he was with Flores, when Flores received a call some someone reporting that the father of MS-13 member "Pistolita" had been shot; Flores stated that "perhaps it was the *chapos* who had hit him; since they couldn't hit us, they wanted to take it out on our family," and then ordered retaliation, suggesting that gang members use knives because they did not have guns, Tr. at 10582-83, which led to the stabbing death of 14-year old Ivan Miranda; and

(12) Espinal also testified a few days after the murder of Ivan Miranda, Flores told him that MS-13 "Duende"— i.e., Marlon Rivera, one of he gang members who stabbed Miranda to death — had been "very crazy" and had "earned his letters really well," Tr at 10596.

Given the evidence in the record, the murders of Ernad Joldic, Philip Ng, Juan Rodriguez, Armando Estrada, and Ivan Miranda were absolutely reasonably foreseeable to Flores.

Accordingly, the Probation Office properly attributed the murders to Flores.

> ii.    *The Probation Office Properly Applied a Four-Level Aggravating Role Adjustment to Flores*

Flores also contends that the Probation Office erred by applying to him a four-level

aggravating role adjustment, pursuant to U.S.S.G. § 3B1.1.  This objection has no merit.  The evidence in the record clearly establishes by at least a preponderance of the evidence that Flores was an "organizer or leader of criminal activity that involved five or more participants or was otherwise extensive."

For instance, as demonstrated above, Flores affirmatively ordered retaliation in response to the shooting of Danilo Velasquez and the shooting of "Pistolita"'s father, which begat the murders of Ernad Joldic and Philip Ng and Ivan Miranda, respectively.  In addition, on July 20, 2008, Flores also ordered 20th Street members to split into two groups to fight the *nieros*.

Moreover, the record contains additional examples of Flores's leadership position within he 20th Street clique.  For example:

(1) Abraham Martinez testified that shortly after he got out of jail in 2008, he encountered Flores, who stated that "Cyco" and "Peloncito" were in jail but had left him (Flores) in charge, and that he was trying to continue to carry out the "program" of "Cyco" and "Peloncito," Tr. at 2291-92;

(2) Martinez also testified that after the funeral of MS-13 member "Maya" in March 2008, he and Jonathan Cruz-Ramirez got into an argument and Flores, claiming the leadership of the 20th Street clique, threatened to have them both "regulated," Tr. at 2367-68;

(3) Walter Palma testified that Flores and "Cyco" recruited him into MS-13, see Tr. at 7330, and that Flores took over the 20th Street clique after the arrest of Marvin Carcamo and Angel Guevara, see Tr. at 7396-97;

(4) Cooperator Carlos Garrido testified that Flores "told [him] that he has to cover the 20th Street clique when Cyco and Peloncito got arrested," Tr. at 9598, that "he has a little crew of solid soldiers under his watch, and that 20th Street has been progressing during his leadership;" and

(5) Jose Espinal testified that Flores was present for his (Espinal's) jumping in at Dolores Park in 2008, and that Flores picked the gang members who conducted the beating and also counted during the beating, see Tr. at 10478.

Furthermore, consistent with Flores leading the 20th Street clique on the street with guidance from Carcamo and Guevara in jail, during a March 8, 2008 jail call between Marvin Carcamo and Flores, Flores reported on the status of new members of their "team," and Carcamo told Flores that he trusted Flores.  See GX 183T-B (transcript of March 8, 2008 jail call).  Indeed, during a recording of a gang meeting on or about April 28, 2008, Flores declared, "I represent the *Mara* here," and then made a referenced to the "Los" program.  GX 152T (transcript of April 28,

1    2008 recording).

2         Accordingly, the four-level aggravating role adjustment under U.S.S.G. § 3B1.1 is

3    supported by at least a preponderance of the evidence.

4         *iii.    Flores's Mitigation Claims Are Meritless*

5         Flores presents several claims in mitigation of his sentence.  None has any merit.

6         First, Flores parrots the "sentencing entrapment" claim raised by his co-defendants,

7    arguing that the Government's informants somehow turned the 20th Street clique from peace-

8    loving soccer players into murderous thugs.  This assertion is nothing short of delusional.  As

9    explained in greater detail in the Government's response to Jonathan Cruz-Ramirez's sentencing

10   motion based on sentencing entrapment (see Docket #5347), the 20th Street clique — like any

11   other clique of MS-13 — has always been murderous.  The violent nature of the gang was not

12   brought about by the informants.  In addition, the so-called "new rules" that the defendants

13   breathlessly bleat were imposed by the informants were not, in fact, imposed on anyone.

14   Furthermore, the rules were not new, and they merely focused on making gang meetings more

15   civil and orderly.  Murder was in the hearts and minds of the defendants from day one.

16        In addition, as the Court itself found during trial (see Docket #4898, August 2, 2011 order

17   excluding entrapment defense), there was not even slight evidence adduced at trial that any of the

18   defendants were induced to commit any of the crimes charged.  Flores can point to no specific

19   instance during which either of the Government's informants specifically induced him to join the

20   MS-13 racketeering enterprise and agree to its murderous objectives.  See United States v.

21   Spentz, 653 F.3d 815, 819 (9th Cir. 2011) ("an inducement consists of an opportunity plus

22   something else — typically, excessive pressure by the government upon the defendant or the

23   government's taking advantage of an alternative, non-criminal type of motive") (internal

24   quotation marks and alterations omitted); United States v. Simas, 937 F.2d 459, 462 (9th Cir.

25   1991) ("Mere suggestions or the offering of an opportunity to commit a crime is not conduct

26   amounting to inducement.").  Indeed, San Francisco Police Sergeant Mario Molina testified that

27   he spoke with Flores in 2004, who claimed that he had been a member of MS-13 since *2001*, see

28   Tr. at 11742, well before anyone became a federal informant in this case.

-10-

Flores also contends that the Court should treat him with lenity because he is a "juvenile" offender. This claim is utterly baseless: Flores was born on November 14, 1988. He is not a juvenile. In fact, he turned 18 on November 14, 2006, well before 2008, when, under his leadership, the 20th Street clique carried out its bloodiest campaign of violence.

Flores further contends that a sentence of more than his requested 35 years would result in sentencing disparities with other defendants. He is wrong. The other defendants whose sentences he cites were not similarly situated. Ivan Cerna, for instance, was the leader of the 20th Street clique for years, but used his position to defuse conflicts with the *nieros* and the 11th Street *Sureños*. Cesar Alvarado and Walter Chinchilla-Linar, in turn, though legally culpable in the murder of Ivan Miranda, were not direct participants in this murder. Rather, two other MS-13 members, Marlon Rivera and Rony Aguilera, chased Miranda for a block and stabbed him to death while Alvardo and Chinchilla-Linar merely robbed the victims they confronted. Moreover, all of these defendant pled guilty and accepted responsibility for their crimes. In contrast, despite being confronted with a mountain of damning evidence during the course of a five-month trial, Flores continues to claim to be a victim of Government entrapment. Flores fails to accept responsibility for the full scope of his conduct.

## III.    Conclusion

By any calculation, Flores's applicable Guidelines offense level is 43 and his sentencing range is life. Given the facts in the record and the various sentencing factors under 18 U.S.C. § 3553(a), the Court should impose the statutory maximum sentence for each count of conviction — to wit, life for Count One (racketeering conspiracy), ten years for Count Two (conspiracy to commit murder in aid of racketeering), three years for Count Three (conspiracy to commit assault with a dangerous weapon in aid of racketeering, and life for Count Four (possessing a firearm in furtherance of the racketeering-related conspiracies) — and should impose these sentences consecutively. Flores willingly joined in a murderous criminal enterprise that was responsible for at least five brutal murders.[1] He exhorted the gang members under his leadership to increase

---

[1] The Government believes that the evidence presented during Flores's trial and the more recent trial of Danilo Velasquez and Luis Herrera establishes that MS-13 members were

their acts of violence, which resulted in the bloodletting of 2008.  Flores has shown no remorse nor demonstrated any acceptance of responsibility for his crimes.  Given these circumstances, Flores should spend two lifetimes and thirteen years in prison.

DATED: November 29, 2011                    Respectfully submitted,

                                            MELINDA HAAG
                                            United States Attorney

                                     By:    ___/s/_____
                                            W.S. Wilson Leung
                                            Wil Frentzen
                                            Assistant United States Attorneys

                                            Theryn G. Gibbons
                                            Trial Attorney

---

responsible for well more than the five murders discussed herein.  For the purpose of Flores's sentencing, however, consideration of the murders of Ernad Joldic, Philip Ng, Juan Rodriguez, Armando Estrada, and Ivan Miranda is sufficient.